## Greiner v. Alfred Struck Company, etc.

(Decided December 18, 1914.)

### Appeal from Jefferson Circuit Court
### (Common Pleas Branch, Third Division).

1. Damages—Surface Water—Overflow of.—In an action to recover for overflow of property, where all the evidence shows that it was an unprecedented and extraordinary rain and there is no proof to show that ordinary prudence could have provided against it, there is no liability.

2. Damages—Surface Water—Overflow of.—If the flood crest below and above the obstruction is higher than the level of the property damaged, and this height is reached by the water independent of the obstruction, the flooding of the property is inevitable, and there is no liability.

DODD & DODD for appellant.

LEON P. LEWIS and PENDLETON BECKLEY for appellee, City of Louisville.

H. H. NETTLEROTH for appellee, Alfred Struck Company.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

The appellant seeks to recover damages from the appellees, Struck Company and the City of Louisville, caused to his property by an overflow of the waters of Beargrass Creek in the City of Louisville. The petition

charges that in 1904, the Struck Company, under a permit from the city, erected a covered bridge across Beargrass Creek, in such a manner as to interfere with its natural flow, and that by reason thereof, on February 23rd and 24th, 1909:

"The water that would have naturally flowed in the bed or through the channel of the said stream or watercourse of Beargrass Creek, was obstructed, and backed up from the said structure so erected by the defendant, the Alfred Struck Company, as to accumulate southwardly of the said building and between the said building and Broadway street in such quantities as to overflow and wash away the roadbed or embankment of the Louisville and Nashville Railroad Company lying southeastwardly of the said building and between said property upon which the said building is erected and the property of the plaintiff, and thereby occasioned the flooding and overflow of water in and upon the premises of the plaintiff to a depth of several feet."

The appellees by separate answer traverse the material allegations, and defend affirmatively on the ground that the overflow was caused by such an unusual and extraordinary rain as could not have been anticipated by persons of ordinary experience and prudence.

At the conclusion of all the evidence, the court peremptorily instructed the jury to find for the defendants, and the reason assigned was that all the evidence went to show that it was such an unusual and extraordinary rain as could not have been guarded against by ordinary prudence, and that there was not a scintilla of evidence to the contrary. Southern Railway Co. v. A. M. E. Church, 121 S. W., 972; Wallingford, Etc. v. Maysville & B. S. Ry. Co., 107 S. W., 781; M. H. & E. R. Co. v. Renfro, 127 S. W., 508; M. H. & E. R. Co. v. Thomas, 140 Ky., 143; M. H. & E. R. Co. v. Graham, 147 Ky., 604; M. H. & E. R. Co. v. Cates, 138 Ky., 257.

If there was a conflict in the testimony, or if there was any evidence to show that the rains which caused this overflow were not of such an unusual or extraordinary character as could not have been anticipated by ordinary prudence, then the question should have been submitted to the jury. To decide this case, it is only necessary to examine the proof on that question, and see if there is any conflict. The only proof on this point was given by appellant and his witness Mr. Walz, the officer in charge of the United States Weather Bureau

at Louisville. To understand the bridge references these witnesses make, it should be explained that the property of both parties fronts on Broadway, and that Beargrass flows under Broadway at what is called Broadway arch, and near where the L. & N. crosses Broadway. From this arch at Broadway it flows through the Struck property and about 200 feet with the creek to the covered bridge erected by Struck. Then in about 25 feet it flows under the L. & N. bridge. We quote from the appellant's testimony:

"Q. Had there ever been any rains or rain fall as great as this since you had property there? A. Yes. Q. Since you had these improvements of which you speak? A. Yes. Q. When was that? A. That was 1896, on the 4th day of July. Q. Was that rain greater or less? A. It was a greater rain than this. I saw it in the paper. The Court: You can tell how the rain affected your premises. Q. How did the rain on the 4th day of July, 1896, affect your premises, if at all? A. Well, the rain from the street gutters, some of it got in my back yard. Q. Did any come over Beargrass Creek on that occasion, either head water or back water? A. None at all. Q. Did you ever, on any occasion than the twenty-third and twenty-fourth day of February, 1909, sustain any injury to your property from the head-water? A. Never, as I know of."

On cross-examination, the witness testified:

"Q. Now, you testified as to the rain on July 4th, 1896, did the creek overflow Broadway on that occasion? A. No, sir, not to my recollection. Q. Was your property submerged? A. No, sir. Q. At that time state whether or not this railroad bridge was across the creek at that time? A. There was a bridge there, yes. Q. It has been raised since, a little bit? A. I think it had, I am not sure. All of that fill was raised, I believe. Q. This same railroad bridge was there in 1896, or one lower than this was there, that is true? A. Yes. Q. Either one of those conditions existed? A. Yes. Q. On July 4th, 1896, when that other heavy rain occurred Beargrass Creek didn't overflow? A. No, sir. Q. The bridge didn't fill up? A. No, sir. Q. How long have you lived in Louisville? A. About 58 years. Q. You have been familiar with Beargrass Creek at this point practically all that time? A. Yes. Q. Since you were old enough to go fishing. Do you know of any occasion where Beargrass Creek filled up the Broadway arch as

the result of water that came down the creek, I am not speaking of backwater? A. I have no recollection of seeing anything like that, not even 1896."

Although admitting that Beargrass did not get out of its banks in 1896, he says it was a greater rainfall. But it appears that what he saw in the newspaper is his authority for that statement. The author of the newspaper reports about rainfall is Mr. Walz of the Weather Bureau.

He was introduced by appellant and had before him the records of that office since 1871. Mr. Walz testifies that the rainfall in 1909, which caused the flood in question, was the greatest ever known. For any 24-hour period it was exceeded only by that of July 4th, 1896, when there was a 5½ inch rainfall. On February 23, 1909, there was a fall of 5.02 inches, but it was only one of two or three days' continuous rain, and the records show that when this rain began on the 23rd, more rain had already fallen in that month than normally falls in the whole month. As the witness says, with the soil thus soaked, and being a general rain extending over the whole watershed of Beargrass Creek, it easily ranks without a precedent. It is comparable only with that of July 4th, 1896, in which slightly more rain fell in ten hours than in any 24-hours of the February rain. The July 4th rain was a waterspout, local in character, and fell when the soil was relatively dry.

This being all the evidence on the point, we think the court properly concluded there was nothing for the jury to consider, because there was no evidence to show that ordinary prudence could have provided against such a flood, and that, in fact, it amounted to an act of God, affording relief from liability.

The covered bridge was built in 1904, and its water-way area under the bridge is materially larger than that under either the Broadway or L. & N. bridges, but those bridges were able to carry without difficulty all the water flow of July 4th, 1896. The rain in question filled Broadway arch and overflowed Broadway street, and the L. & N. bridge and track.

Although appellant's property is below, that is, down the creek from the covered bridge, and while water backed up by an obstruction in a stream will ordinarily affect only upstream property owners, it will be noticed appellant's claim is based upon the idea that the back water overflowed, that is, cut through, or washed away

the embankment or roadbed of the L. & N. R. R., and that this roadbed operated as a protecting levee to his place. The ground level of his property is about eight or ten feet below the level of the railroad track. Under these circumstances if the flood crest did not come higher than the embankment, and there was any proof to show that the covered bridge threw the current against the embankment, and in that way cut through or washed it away (and there was such proof), then the case should have gone to the jury. But when all the evidence shows that the flood crest both below and above the bridge was at least three feet above the levee, that is, above the railroad track, then it follows that his property is flooded of necessity, and independent of any diversion of the current, or of any washing away of the embankment. In that state of case there is nothing to go to the jury. These conclusions make it unnecessary to consider the question of the city's liability growing out of the issual of a building permit.

For the reasons indicated, the judgment is affirmed.